# , UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of: | ) ) ) |
| Information associated with the  account identified as B&M Noble Co., doing business as DuChateau, ("the **SUBJECT ACCOUNT**") that is within the possession, custody, or control of (<u>Oracle Corporation/Oracle NetSuite Cloud Business Management Software Suite</u>) (the "**PROVIDER**") | ) ) ) ) ) ) ) ) |

Case No. 2:20-MJ-03846

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A, incorporated herein by reference*

There are now concealed or contained the items described below:

*See Attachment B, incorporated herein by reference*

The basis for the search is:

☑ Evidence of a crime;

☑ Contraband, fruits of crime, or other items illegally possessed;

☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 16 U.S.C. 3372, 3373 | False labeling or account of plants |
| 18 U.S.C. 2320(a) | Trafficking in counterfeit goods |
| 18 U.S.C. 371 | Conspiracy |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

John Pritting, Special Agent USFWS
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State: _____

_____
*Judge's signature*

Jean P. Rosenbluth, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Joseph Johns/joseph.johns@usdoj.gov/213-894-4536

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with  B&M Noble Co., doing business as DuChateau, ("the **SUBJECT ACCOUNT**") that is within the possession, custody, or control of the Oracle Corporation/Oracle NetSuite Cloud Business Management Software Suite (the "**PROVIDER**"), a company that accepts service of legal process at 500 Oracle Parkway, Redwood Shores, CA 94065, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

## ITEMS TO BE SEIZED

## I.    SEARCH PROCEDURES

1.      The warrant will be presented to personnel of the Oracle Corporation/Oracle NetSuite Cloud Business Management Software Suite (the "**PROVIDER**"), who will be directed to isolate the information described in Section II below.

2.      To minimize any disruption of service to the third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.      The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.      With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and

seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

5.     The items to be seized are fruits, instrumentalities, and evidence of violations of Title 16 U.S.C. §§ 3372(d) and (f) and 3373(d), and violations of 18 U.S.C. §§ 371 and 2320(a)(1), for the period from April 1, 2016, to present (unless otherwise noted).

6.     In this warrant, the term "document" means written, printed, typed, recorded, electronic or graphic matter of every type or description, formal or informal, including email communication, notes, memoranda, correspondence, business records, financial and accounting records, desk pads, notebooks, appointment books, calendars, forms, pamphlets, reports, microfilm, scanned documents, program, applications, images, or other materials, created, modified or stored in any form, including in any data storage system, to include electronic storage media.

7.     The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating

3

agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.      If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

9.      The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

10.      Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original

production which fell outside the scope of the items to be seized absent further order of the Court.

11.     The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

12.     Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.     INFORMATION TO BE DISCLOSED BY THE PROVIDER

1.     To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each B&M Noble Co., dba DuChateau, account ("the **SUBJECT ACCOUNT**) listed in Attachment A:

a.     All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred on or after October 1, 2015, including:

i.      All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including but not limited to stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.      All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including but not limited to address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, invoices, inventories, purchase orders, account settings, access logs, and files.

iii.      All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including but not limited to contacts with support services and records of actions taken.

b.      All other records and information, including but not limited to:

i.      All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email

addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following account: B&M Noble Co., doing business as DuChateau  ("the **SUBJECT ACCOUNT**").

       c.      All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above, including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

## III.   INFORMATION TO BE SEIZED BY THE GOVERNMENT

Items to be seized are limited to the following:

1. Any and all documents relating to the importation of wood products (including but not limited to hard-wood flooring materials and packaging) from YUHUA between April 1, 2016 and the present, including but not limited to invoices, emails, photographs, purchase

7

orders, bills of lading, customs declarations, and Lacey Act declarations.

2. Any and all documents relating to wood products or packaging for wood products, labeled as "FSC certified" or with another "FSC" designation, "LEED," or "Lacey Act compliant," and any records of such labels, including labels, stamps, invoices, purchase orders, advertising, emails, or other records bearing or relating to such labeling.

3. Any and all documents, including but not limited to emails, correspondence, articles, copies of laws, audits, photographs, permits, licenses or other information or communications relating to sourcing of wood products from YUHUA, including but not limited to source verification or quality control of wood products from YUHUA.

4. Documents relating to the Lacey Act or other laws or regulations relating to the harvest, possession, sale, or transportation of wood or wood products, including but not limited to Internet searches, copies of the statute, declaration forms, compliance plans or guidance, training materials, articles in publications, correspondence or other communications.

5. Documents, including but not limited to, ledgers, business records, notes, credit card receipts, shipping records, financial transaction

records, money orders, electronic mail, bills of lading, invoices, communications, or other records related to the harvest, procurement, sourcing, pricing, availability, duty or tariff rates for, marketing, legality, certification, storage, transfer, transportation, labeling, or purchase of wood products from China between October 1, 2015 and the present.

6. Documents related to the obtaining, secreting, transferring, concealing, and/or the spending of proceeds related to or connected with the procurement or sale of imported timber from YUHUA.

7. Documents relating to any communication with government entities, and/or individuals or associations in the U.S. or foreign countries regarding the permitting, licensing or other legally-required processes related to importing wood products from foreign countries into the United States.

8. Documents relating to any communication between persons associated with DUCHATEAU and persons associated with YUHUA regarding the labeling of wood products, including information to be placed on labels of products purchased by DUCHATEAU.

9.  Documents relating to FSC licensing or certification, including obtaining it, retaining it, having it suspended or revoked, and terminating it.

10. Documents related to membership in the U.S. Green Building Council or to LEEDS certification, or use of related logos.

11. Records tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of electronic information in (1) - (10) above.

12. User-attribution data to include data reflecting who used or controlled the computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed. User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.

All of the above categories of records to be seized are limited to evidence of the false labeling of, and counterfeit use of trademarks on, wood flooring products imported into the United States and its subsequent sale, trade and/or transportation,

and agreements to do the same, during the period from April 1, 2016 to present, in

violation of Title 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 2320 (Trafficking in

Counterfeit Goods), and 16 U.S.C. §§ 3372(d) and 3373(d) (false labeling of plant

products).

## II. PROVIDER PROCEDURES

IT IS ORDERED that the PROVIDER shall deliver the information set forth

in Section II within 10 days of the service of this warrant.  The PROVIDER shall

send such information to: Notwithstanding 18 U.S.C. § 2252/2252A or any similar

statute or code, the provider shall disclose responsive data by sending it to the

following address via US Mail, or to the following email address:

Special Agent John Pritting
5622 Price Ave.
McClellan, CA 95652
(916) 365-5820
John_pritting@fws.gov

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR

## SEARCH AND SEIZURE WARRANTS

I, Special Agent John Pritting, United States Fish and Wildlife Service, Office of Law Enforcement, being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent ("SA") of the United States Fish and Wildlife Service ("USFWS") and am presently assigned to the McClellan, California, field office. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 16, United States Code, Section 3375. As such, I am a Federal Law Enforcement Officer within the meaning of Rule 41(a), Federal Rules of Criminal Procedure. As part of my duties as a USFWS SA, I investigate criminal violations relating to the taking, selling, possession, and transporting of wildlife and plants, and products thereof, in violation of federal wildlife and related statutes.

2.      I have been employed with the USFWS since approximately March 2016. From 2014 to 2016, I was employed as a Deputy Sheriff with the Napa County Sheriff's Office. From 2011 to 2014, I was employed as a Game Warden for the California Department of Fish and Wildlife. Before my civilian law enforcement career began, I was enlisted as a Security Forces officer (military police) in the United States Air Force from 1998 to 2002. I am a graduate of the Federal Law Enforcement Training Center, Criminal Investigator Training Program; the USFWS

1

SA Basic School; California Peace Officer Basic Training Police Academy; and the Air Force Security Forces Military Police Academy. I graduated with a bachelor's degree in Wildlife, Fish, and Conservation Biology from the University of California, Davis. I have over 12 years of combined law enforcement experience. In that time, I have investigated complex natural resource crimes involving violations related to the interstate and international trafficking of natural resources.

3.     From my training and experience, I am familiar with the laws and regulations enforced by USFWS, including the Endangered Species Act, Title 16, United States Code, Section 1531 et seq. (hereinafter the "Endangered Species Act"), and the Lacey Act, Title 16, United States Code, Sections 3371, et seq. (hereinafter the "Lacey Act"). I have prepared and participated in the execution of multiple federal search warrants.

4.     I make this affidavit in support of an application for a warrant for information associated with the account identified as the account of B&M Noble Co. (the "SUBJECT ACCOUNT") that is stored at premises controlled by Oracle Corporation/Oracle NetSuite Cloud Business Management Software Suite (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 500 Oracle Parkway, Redwood Shores, CA 94065.[1] The

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . .

information to be searched is described in Attachment A.  This affidavit is made in

support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A),

2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the

government copies of the information (including the content of communications)

described in Section II of Attachment B.  Upon receipt of the information

described in Section II of Attachment B, law enforcement agents of the USFWS

and/or the Department of Homeland Security – Investigations (hereinafter "HSI"),

and/or individuals assisting law enforcement and acting at their direction, will

review that information to locate the items described in Section III of Attachment

B.  Attachments A and B are incorporated herein by reference.

---

pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent
jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge
of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense
being investigated; (ii) is in or for a district in which the provider of a wire or electronic
communication service is located or in which the wire or electronic communications, records, or
other information are stored; or (iii) is acting on a request for foreign assistance pursuant to
section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the
basic subscriber information, which does not contain content, the government needs only a
subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other
information--but not content--pertaining to subscribers of an electronic communications service
or remote computing service, the government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific and articulable facts showing
that there are reasonable grounds to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to
18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see
Attachment B paragraph II.10.a.) as well as subscriber records and other records and information
that do not contain content (see Attachment B paragraph II.10.b.).

5.      As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations including conspiracy (18 U.S.C. § 371), trafficking in counterfeit goods (18 U.S.C. § 2320(a)(1)), and false labeling in violation of the Lacey Act (16 U.S.C. §§ 3372(d) and 3373(d)(3)(A)).

6.      The facts set forth in this affidavit come from my personal observations, my training and experience, investigative reports, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of the information known to me or other agents about this matter. Unless otherwise indicated, statements attributed to individuals in this affidavit are set forth in summary and in part.

## II.    SUMMARY OF LAWS RELEVANT TO THE INVESTIGATION

7.      The USFWS and Department of Homeland Security – Investigations, enforce multiple laws and regulations relating to trafficking in wildlife and plants, including the Lacey Act Amendments of 1981 (16 U.S.C. §§ 3371 *et seq.*); Trafficking in Counterfeit Goods (18 U.S.C. § 2320), and Conspiracy (18 U.S.C. § 371).

4

8.      The Lacey Act makes it a crime for a person to, among other things, knowingly make or submit any false record, account, or label for, or any false identification of any plant which has been, or is intended to be, imported, exported, transported, sold, purchased, or received from any foreign country, or transported in interstate or foreign commerce. 16 U.S.C. §§ 3372(d), 3373(d)(3). "Plant" means "any wild member of the plant kingdom . . . including products thereof, and including trees from either natural or planted forest stands." 16 U.S.C. § 3371(f). "Import" means to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States. 16 U.S.C. § 3371(b).

9.      Title 18, United States Code, Section 2320(a)(1), makes it a crime to traffic in goods or services and knowingly use a counterfeit mark on or in connection with such goods or services. "Counterfeit mark" means a spurious mark that is (a) used in connection with trafficking in any goods, labels, stickers, wrappers, boxes, containers, documentation, or packaging of any type or nature; (b) identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office ("USPTO") and in use, whether or not the defendant knew such mark was so registered; (c) applied to or used in connection with the goods or services for which the mark is registered with the

USPTO, or is applied to or consists of a label, sticker, wrapper, box, container, documentation, or packaging of any type or nature that is designed, marketed, or otherwise intended to be used on or in connection with the goods or services for which the mark is registered in the USPTO; and (d) likely to cause confusion, to cause mistake, or to deceive. 18 U.S.C. § 2320(f)(1)(A).

10.     Under U.S. Customs law, Title 19, United States Code, Section 1508, importers must keep records, including statements, declarations, documents and electronically generated or machine-readable data that pertain to any such importation, or to information contained in the records in connection with such activity that are normally kept in the ordinary course of business. The records must be maintained for 5 years. 19 C.F.R. § 163.4. Records are defined as books, papers, correspondence, accounts, financial accounting data, technical data, computer programs necessary to retrieve the information in a usable form, as well as all documents required to make a lawful entry.  19 C.F.R. § 163.1(a)(1).

### III.   STATEMENT OF PROBABLE CAUSE

### A.   BACKGROUND

11.     B&M Noble Co. was incorporated in California in 2006. Its headquarters are located in San Diego, California. B&M Noble engages in trade in, among other things, wood flooring. B&M Noble also does business as DuChateau, which describes itself on Internet sites as a lifestyle brand specializing in the

manufacture of luxury architectural finishes from hardwood and vinyl flooring to wall coverings and beyond. Companies formed to act as importers for B&M Noble, doing business as ("dba") DuChateau, include Houses of the Holy, LLC, and; 1501 Front Street, LLC. These entities (collectively the "DUCHATEAU GROUP") operate out of the same address: 8480 Miralani Drive, San Diego, California 92126. Misael Tagle and/or Benjamin Buzali act as corporate officers or managers for all of these entities.

12.    Zhejiang Yuhua Timber Co. ("YUHUA") is a manufacturer of wood building materials located in Jiashan City, Zhejiang Province of China. The DUCHATEAU GROUP imported wood flooring from YUHUA through B&M Noble (from approximately August 2017 to March 2019), Houses of the Holy, LLC, (from approximately April 2016 through October 2019), and 1501 Front Street, LLC, (from approximately November 2019 through the present).

**Forest Stewardship Council**

13.    The Forest Stewardship Council ("FSC") is an international nonprofit organization that, among other things, certifies the legal and/or sustainable harvest of, and chain of custody thereafter for, timber. Consumers seeking environmentally friendly products, or products that are more likely to be legally sourced, may prefer FSC-certified products, which may therefore command a higher price than uncertified products.

7

14.     A company requesting FSC certification must meet a set of principles and standards set forth in contractual agreements with FSC and/or third-party auditing companies. To establish entitlement to certification, a company must contact and commission a third-party certifier authorized by FSC (an FSC–accredited Certification Body "CB" or Conformity Assessment Body "CAB") to audit the company and verify its compliance with FSC standards. Once the CB or CAB verifies that all required FSC standards and processes are in place and being followed, a company may be granted FSC certification, for which it must enter into a trade license agreement ("TLA") directly with FSC.

15.     An FSC certification can be for the harvest of wood or for the chain of custody thereafter. The FSC chain of custody is the path taken by products from an FSC-certified forest to the point where the product is sold with an FSC claim and/or it is finished and FSC-labeled.  Any change of ownership along the supply chain of FSC-certified products requires the establishment of effective chain of custody management systems by the respective organization, and verification by an FSC-accredited CB or CAB, if the organization wants to make an FSC claim about its products.

16.     A company holding an FSC chain of custody certification can label goods covered by such a chain of custody as "FSC Certified" (us.fsc.org/en-us) in one of three ways, depending on the scope of its certification: (1) 100% (all the wood

8

in the product originated from FSC certified forests and have been maintained on an

FSC chain of custody thereafter); (2) mixed (only some of the wood in the product

is FSC-certified); or (3) recycled.

17.     Only FSC products that are eligible for FSC labeling may be promoted

with FSC trademarks.  FSC holds several active trademarks (registered with the

USPTO) which have been used in commerce since 1996, including the following:



The USPTO database contains registration information for these marks, including

their intended usage:

> The certification mark as used by authorized persons and firms certifies that
> the wood and paper products on which the mark is applied have been grown
> and processed in accordance with certification guidelines for forest
> management practices that adhere to rigid environmental and socioeconomic
> standards as established by the certifier. The certification mark as used by
> authorized persons and firms also certifies that the forest management, wood
> testing, processing and related services that [sic] have been performed in
> accordance with guidelines for forest management practices that adhere to
> strict environmental and socioeconomic standards as established by the
> certifier.

https://trademarks.justia.com/755/97/fsc-75597772.html.  Thus, these marks can

only be used on, or to indicate, FSC-certified wood.

18.     Under FSC TLAs, the FSC label must specify whether the product is 100%, mixed, or recycled, such as the following:



If a claim of "FSC 100%" is to be made for a product, all inputs into the product must be 100% FSC-certified products.

19.     As of approximately June 2, 2008, YUHUA: (1) held FSC chain of custody certificate DNV-COC-000030, for oak, eucalyptus and poplar, administered by DNV GL Business Assurance Sweden AB ("DNV Sweden"), an FSC-accredited CAB, and; (2) was party to FSC TLAN FSC-C002798. Both the certificate and the TLA were suspended by FSC on approximately May 21, 2018, and terminated on approximately June 7, 2018.

20.     As of approximately May 8, 2009, B&M Noble dba DuChateau: (1) held FSC chain of custody certificate TT-COC-004905, for oak, ash, walnut, and larch, administered by BM Trada/Exova ("BM Trada"), an FSC-accredited CAB, and: (2) was party to FSC TLAN FSC-C103256. Both the certificate and the TLA

were suspended by FSC on approximately May 21, 2018, and terminated on approximately July 9, 2018.

**U.S. Green Building Council**

21.    The U.S. Green Building Council ("USGBC") is a private 501(c)3, membership-based, non-profit organization that promotes sustainability in building design, construction, and operation. The USGBC may be best known for its development of the Leadership in Energy and Environmental Design ("LEED") green building rating systems. The USGBC holds the following registered trademarks, among others:



The USGBC Member trademark is registered for goods and services to denote membership in an association of environmentally-conscious developers in the fields of design, construction, and operation of buildings and real estate. The LEED wordmark is registered for use in the development and dissemination of education materials for others in the field of environmental design, construction, and operation

of buildings and real estate; and for services involving the formulation of standards and best practices for the same. The USGBC guidance to its members specifically prohibits the use of these marks on products, labels and packaging, because the USGBC does not review, certify, or endorse third-party products or services.  Thus, the USGBC's marks must not be used to suggest or indicate any kind of endorsement by the USGBC of any product or to indicate that an official status for any product or service has been conferred by, or is otherwise associated with the USGBC. https://www.usgbc.org/resources/usgbc-trademark-policy-and-branding-guidelines. To do so is misleading.

22.     B&M Noble was an organizational level member of USGBC from 2009 through March 2019 (in May 2018 USGBC changed the company name in its database to "DuChateau"). DuChateau's USGBC membership—and thus its authorized use of the USGBC member logo—expired after it failed to renew and pay its 2019 membership dues. According to USGBC's website, none of the

DUCHATEAU   GROUP   entities   currently   hold   membership   status.
https://www.usgbc.org/organizations.

## B.     PROBABLE CAUSE TO BELIEVE A CRIME WAS COMMITTED

**Sierra Club Complaint**

23.     The Sierra Club is a nonprofit, member-supported public interest organization that promotes conservation of the natural environment by influencing public policy decisions.

24.     On approximately August 16, 2017, the Sierra Club filed a formal fraud complaint against B&M Noble dba DuChateau with B&M Noble's FSC-certified CAB, BM Trada ("Trada"). The Sierra Club simultaneously filed a formal fraud complaint against YUHUA with YUHUA's FSC-certified CAB, DNV Sweden ("DNV").  The Sierra Club also sent a copy of each complaint to Accreditation Services International GmbH ("ASI"), a company used by FSC to accredit and audit its CABs.  The complaints alleged that:

A.     B&M Noble dba DuChateau knowingly sold hardwood flooring with false FSC claims.

B.     B&M Noble dba DuChateau asked YUHUA to package non-certified hardwood flooring in boxes that were labeled with FSC certified claims.

C.      YUHUA complied with B&M Noble dba Duchateau's request and mixed FSC-certified and non-FSC-certified flooring in batches of product bearing FSC 100% claims.

**ASI Investigation**

25.      ASI, working with Trada and DNV, investigated the complaints submitted by the Sierra Club.

26.      First, DNV conducted an onsite surveillance audit of YUHUA between September 11 and 15, 2017. Also that fall, Trada conducted its annual recertification audit of B&M Noble dba DuChateau, and found a major nonconformity in the company's processes.

27.      ASI reviewed DNV's audit of YUHUA, and Trada's resolution of the major nonconformity of B&M Noble dba DuChateau. As a result, in November 2017, ASI decided to conduct a transaction verification, finalized in approximately February 2018. The transaction verification involved analyzing data that each company reported to its respective CAB. Specifically, ASI requested from each CAB its client's reported data for oak flooring transactions (oak being the only type of wood for which both sides of the transactions held an FSC chain of custody certificate) for 2016 through September 2017. That data reflected FSC timber purchases by YUHUA, sales of FSC timber from YUHUA to the DUCHATEAU GROUP, purchases of FSC timber by the DUCHATEAU GROUP from YUHUA,

14

and sales of FSC timber by the DUCHATEAU GROUP to customers. The amount sold by YUHUA should be no more than the amount that could result from its purchases. The amount purchased and resold by the DUCHATEAU GROUP should be no more than the amount YUHUA reported selling to it. ASI's calculations based on that data revealed substantially more oak wood flooring volume being claimed by the DUCHATEAU GROUP as being purchased from YUHUA than was claimed by YUHUA to have been sold to the DUCHATEAU GROUP.

28.     Based on the results of the transaction verification, as well as a further surveillance audit for B&M Noble dba DuChateau by Trada, ASI conducted an unannounced compliance assessment at the DUCHATEAU GROUP on March 23, 2018. As part of that assessment process, the DUCHATEAU GROUP provided a spreadsheet of its purchases from YUHUA during 2017, invoice by invoice, and divided into FSC-certified and non-FSC-certified products. A few of the invoices listed on the spreadsheet were physically acquired and examined by the assessor.

29.     On April 3, 2018, DNV conducted its regular annual recertification audit of YUHUA. During this audit, and at ASI's request, DNV had YUHUA provide a spreadsheet of its sales to the DUCHATEAU GROUP, invoice by invoice and divided into FSC-certified and non-FSC-certified products, so that this information could be compared with that provided by the DUCHATEAU GROUP

in March. Three of the same invoices obtained from the DUCHATEAU GROUP also were obtained from YUHUA.

30.    ASI compared the list of invoices provided by each company, and the claims made by each as to whether each invoice was for FSC-certified or non-FSC wood products. ASI identified 77 instances where the DUCHATEAU GROUP's purchase records claimed the purchases were of FSC 100% wood (thus supporting that volume of FSC 100% sales to the DUCHATEAU GROUP's customers), but YUHUA's corresponding sales records did not reflect that the products sold were of FSC 100% wood.

31.    In one example, YUHUA identified its sale to B&M Noble Co., of walnut flooring in invoice WXYH17001-MX as non-FSC. Commercial invoice WXYH17001-MX, obtained from YUHUA, has no FSC logo and no FSC claim. Walnut is not covered by the chain of custody certification held by YUHUA. However, the DUCHATEAU GROUP identified the wood it purchased under invoice WXYH17001-MX as FSC-certified.

32.    In another example, commercial invoice #WXYH16140-CA, obtained from YUHUA, has a generic FSC logo on the top right, suggesting (improperly) that YUHUA participated in the FSC program, but the invoice does not bear any claim that the specific wood sold is FSC-certified. YUHUA identified its sale of wood product to Houses of the Holy, LLC, in invoice #WXYH16140-CA as non-FSC.

Houses of the Holy, LLC, however, identified the wood product from invoice #WXYH16140-CA as FSC-certified. The copies of YUHUA's and Houses of the Holy's invoice #WXYH16140-CA differ. While the Houses of the Holy, LLC, copy also has a generic FSC logo on the top right, the logo is smaller and placed higher, allowing the inclusion below it of the statement "FSC 100% for products from FSC 100% product groups." Below is a copy of the relevant part of the invoice from YUHUA followed by the invoice from the DUCHATEAU GROUP:





33.    An ASI auditor explained that ASI has seen the generic FSC logo intentionally used without the required item-specific 100% claim in circumstances in which the seller wants to give the impression that the wood is FSC-certified, while maintaining the ability to say to its CAB during an audit that it was not making any FSC claim. This allows the seller to ensure that the amount of FSC wood it

documents having sold does not exceed the amount it could document purchasing, while allowing the buyer to claim it believed the wood was FSC-certified, and thus ensure that the amount of FSC wood it documents purchasing is not less than the amount it documents reselling. The DUCHATEAU GROUP's sales invoices for its resale of products purchased from YUHUA reflect, as in the Sierra Club invoice below, not just a generic FSC logo, but a claim of FSC 100% next to each specific wood product on the invoice as to which the claim is being asserted, demonstrating that the DUCHATEAU GROUP knew what was required for such a claim.

34.    ASI ultimately reported to FSC that both certificate holders were passing on false claims and that this had occurred for at least 21 months (January 2016 – September 2017). ASI's report calculated that approximately 79% of all the flooring, or approximately 4772m$^3$, that the  DUCHATEAU GROUP purchased from YUHUA in 2016-2017 had false claims, in which an uncertified product was labeled by YUHUA as FSC-certified, and/or sold by the DUCHATEAU GROUP as certified. ASI calculated that 4772m$^3$ is approximately enough flooring to cover 60 football fields.

35.    On May 21, 2018, FSC suspended both certificate holders' license agreements for 12 months.  According to the ASI auditor, the DUCHATEAU GROUP refused to comply with the required corrective action of notifying each of its affected customers that it had received non-FSC certified product incorrectly

labeled as FSC-certified. In approximately July 2018, B&M Noble dba DuChateau terminated its certificates and license agreements. YUHUA failed to resolve its nonconformance issues. FSC responded by blocking both companies from FSC certification of any kind.

## Government Investigation

36.     In March 2019, FSC personnel notified HSI of FSC's investigation into the DUCHATEAU GROUP and YUHUA. HSI and attorneys with the Environment and Natural Resources Division of the U.S. Department of Justice brought the information to USFWS law enforcement personnel.

37.     On or about June 10, 2019, USFWS special agents interviewed a member of the Sierra Club team who had raised the initial complaint of fraud against B&M Noble dba DuChateau. The Sierra Club team member explained that information was brought to them by a member of another hardwood flooring distributor in the United States who had been seeking to do business with YUHUA in China. That individual had informed Sierra Club that YUHUA could not produce very much, if any, FSC-certified material. The individual also informed the Sierra Club team that B&M Noble dba DuChateau nevertheless received all of its timber products from YUHUA and sold them all as FSC 100%. That information sparked Sierra Club to purchase two boxes of flooring material from DuChateau on July 19, 2017. Each box bore an FSC label with its chain of custody certification number.

19

The invoice stated that the wood flooring in the package was "FSC 100%." The Sierra Club provided the following photograph of the package of wood it purchased:



The Sierra Club also provided the following invoice for this purchase:



Agents have not, to date, been able to correlate this particular flooring with a corresponding purchase of flooring from YUHUA and thus cannot definitively show

21

that this particular FSC 100% claim was, or was not, false. However, ASI examined all of the invoice claims made by YUHUA and the DUCHATEAU GROUP for sales and purchases between January and August of 2017 of the two products resold by DuChateau to the Sierra Club. YUHUA listed all sales of these two products to the DUCHATEAU GROUP as non-FSC certified, while the DUCHATEAU GROUP listed them as FSC-certified purchases.

38.   The packaging on the hardwood flooring the Sierra Club purchased, and the invoice associated with it, both bore the USGBC and LEED registered trademarks. USFWS agents made contact with representatives from the USGBC regarding the use of its LEED logo. The representative stated, and later emailed, that the use of that logo was not allowed on any products, even if the company was a USGBC member—only buildings, not products, could be LEED certified. Agents subsequently confirmed that B&M Noble dba DuChateau was a USGBC member from 2009 to March 2019. Agents also found that the USGBC guidance for its clients, available on the Internet, specifies that its trademarks cannot be used on products.

39.   The package also was labeled as "Lacey Act Compliant." There is no such certification and there is probable cause to believe that the product was otherwise falsely labeled, in violation of the Lacey Act, and thus was not compliant with the Lacey Act.

40.     On February 24, 2020, FWS and HSI agents interviewed Angeline Robertson, a former employee of ASI. Ms. Robertson was the lead analyst for ASI's investigation of the DUCHATEAU GROUP. Among other things, Ms. Robertson described the transaction verification and other data analyses she conducted for ASI, as described above.

41.     After the interview, records on which Ms. Robertson had relied for her analyses were produced to the government and reviewed by investigators. Those records included photographs taken of product labels during the March 2018 on site compliance assessment at the DUCHATEAU GROUP's office and warehouse that bore the same claims as those on the boxes of flooring purchased by the Sierra Club. Some of the product labels photographed by the ASI assessor describe the wood product as "European oak." Based on reports I have reviewed, it is my understanding that much  of the oak used in China to produce wood flooring is imported from the Russian Far East part of Asia, which has been reported to have high rates of illegal logging. *See, e.g., United States v. Lumber Liquidators,* 2:15-cr-00126-RAJ-LRL (E.D. VA) (Dkt. #62, Statement of Facts); www.news.stlpublicradio.org/2013-10-22/in-russias-vast-far-east-timber-thieves-thrive.

42.     On March 12, 2020, FWS and HSI agents interviewed a former employee of the DUCHATEAU GROUP. The witness made the following statements, among others:

- She worked at the DUCHATEAU GROUP from 2016 until July 12, 2019.

- The company would print product packaging labels or send an email file of labels that it wanted to appear on their product box to the factory in China (YUHUA), to be affixed on the product packaging.

- The DUCHATEAU GROUP's design team created the logos used on DuChateau's product packaging, and CEOs Benjamin Buzali and Misael Tagle approved the logos and labels.

- The DUCHATEAU GROUP received invoices from YUHUA.

- The DUCHATEAU GROUP wanted the product it was purchasing to be FSC 100% certified and it was her understanding that that was what they received from YUHUA.

- The DUCHATEAU GROUP did not have a compliance plan for Lacey Act and formaldehyde testing compliance when she started working there, but she helped develop one after they lost their FSC certification.

- The "Lacey Act Compliant" label was removed from the packaging in July 2018 after she attended a training course on the Lacey Act and learned that it was not a valid label.

43.     Based on my experience and training, and conversations with other law enforcement agents, I am aware that business persons who attend training seminars are known to bring the training materials back to their

workplace, and that persons engaged in illegally trafficking in timber or in creating compliance plans for trade in timber are known to conduct Internet searches and otherwise gather materials regarding the applicable laws and regulations. I am also aware that a business may communicate with a new overseas supplier for several months before receiving the first shipment of product from that supplier.

44.     Since January 2020, 1501 Front Street, LLC, has imported approximately 94 entries of wood flooring from YUHUA.

45.     On June 26, 2020, inspectors with the Department of Homeland Security, Customs and Border Protection ("CBP"), conducted an inspection at the port of Los Angeles on one shipment of approximately 28 cubic meters of wood flooring, with a declared value of $61,353, from YUHUA to the DUCHATEAU GROUP, specifically 1501 Front Street LLC, 8480 Miralani Dr., San Diego, CA 92126-4349. The FSC logo did not appear on the packages of wood flooring in this shipment, but the "Lacey Act Compliant" label and the USGBC and LEED logos remained, even though DuChateau's membership in the USGBC lapsed in approximately March 2019.

46.     In sum, there is probable cause to believe that DUCHATEAU and YUHUA violated, and conspired to violate, the Lacey Act and trademark protections in that the DUCHATEAU GROUP ordered wood products from

YUHUA and sent to YUHUA generic labeling to be placed on the product packaging that could be used to support an FSC 100%-certified claim. YUHUA filled many of those orders with wood that it knew was not FSC-certified, but nevertheless affixed the FSC trademark labeling as instructed and, on many invoices, improperly included a generic FSC logo. The DUCHATEAU GROUP received invoices from YUHUA that lacked any FSC certification, or had only a generic FSC logo, but nevertheless sold the product to its customers as FSC 100%-certified. The DUCHATEAU GROUP and YUHUA also labeled the product as "Lacey Act Compliant," and with the LEED wordmark and USGBC trademark, all of which were false and/or misleading. The conspiracy to knowingly transport and sell such falsely labeled and trademarked products is a crime under Title 18, United States Code, Section 371; Title 16, United States Code, Sections 3372(d), 3373(d)(3), and; Title 18, United States Code, Section 2320(a)(1).

## C.    PROBABLE CAUSE THAT EVIDENCE OF THE CRIMES WILL BE FOUND WITHIN THE SUBJECT ACCOUNT(S)

47.    In an interview with a former DUCHATEAU employee, the witness stated that as of at least July 2019, the company used both laptop and desktop computers (located at both their business office and their warehouse location) to conduct their business. The witness further stated that the

26

company used a cloud-based software system on its computers, called "NetSuite," for file management, etc. The witness added that the NetSuite system contained such items as the company's orders, purchases, financial records, and product information. During an audit, the auditor would ask the witness or another employee for specific records that they would pull from the NetSuite system. The computers also were used for email correspondence. NetSuite is a product of Oracle (the PROVIDER), which confirmed that B&M Noble is a client and holds a contract with them that runs until June 2021, and confirmed that the services they provide include, but are not limited to, email.

48.     On approximately June 1, 2020, a preservation letter was sent to the PROVIDER requesting that information associated with the accounts held by B&M Noble dba DuChateau be preserved for 90 days pursuant to 18 U.S.C § 2703(f).

## IV.   BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNT AND THE PROVIDER

49.     In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT.  Subscribers obtain an account by registering with the provider.  During the registration process, providers generally ask

their subscribers to provide certain personal identifying information when registering for an e-mail or social media account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

50. Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

51. A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address

28

books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, such as invoices, purchase orders and inventories, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

52.      In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

53.     In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

54.     I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the

contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

55.     Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

56.     I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated

31

words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

57.     This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

58.     As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER,

under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a. I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b. I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers. For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or

33

her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## REQUEST FOR NON-DISCLOSURE

45.     Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until 60 days from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in destruction of or tampering with evidence; intimidation of potential witnesses, or; will otherwise seriously jeopardize the investigation. The government anticipates obtaining and executing a search warrant for the offices and warehouse of the DUCHATEAU GROUP within the next 60 days. Notification in advance of the execution of that warrant would alert the DUCHATEAU GROUP to the ongoing investigation and allow time thereafter for the locations to be cleansed and evidence removed. It would also provide opportunity for witnesses to collude or to intimidate potential employee witnesses.

34

46.     It is respectfully requested that this Court also issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into a criminal organization, and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

## CONCLUSION

47.     Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____

John Pritting, Special Agent
United States Fish & Wildlife Service

Subscribed to and sworn before me
on August ___, 2020.

_____

HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE
JUDGE